FILED

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

2026 APR -6 P 4: 52

----------------------------------- X

JANE DOE,

                       Plaintiff,  :

                                 :

          against          :     Docket No.: 1:26-CV-937-MSN-WBP

                                 :

UNITED STATES OF AMERICA    :     **COMPLAINT**

and                              :

DEPARTMENT OF VETERANS AFFAIRS  :

                     Defendants.

----------------------------------- X

Plaintiff JANE DOE, proceeding pro se, brings this Complaint against the UNITED STATES OF AMERICA and the DEPARTMENT OF VETERANS AFFAIRS ("VA"), (collectively, the 'Defendants'), alleging the following based on personal knowledge as to her own actions and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.      This is a civil action seeking (1) injunctive and declaratory relief under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; the Privacy Act, 5 U.S.C. § 552a; Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; and the Fifth Amendment to the United States Constitution; and (2) monetary damages under the Federal Tort Claims Act ("FTCA"). Plaintiff alleges a pattern of medical negligence, unlawful record withholding, and—most critically—the Deprivation of Due Process through the active manipulation of foundational federal medical records.

2.    Plaintiff is a disabled veteran, a former Doctor of Audiology (Au.D.) candidate, and a qualified individual with ADHD and Level 1 High-functioning Autism. This action does not address a pre-existing inability to work, but rather the Defendants' affirmative destruction of the vocational and clinical infrastructure (provided via VR&E and Section 504) that served as the necessary bridge to Plaintiff's professional licensure disrupted twice within a 12-month span due to the VA's gross negligence.

3.    The underlying harm stems from the VA's catastrophic mismanagement of Plaintiff's essential medication during her doctoral enrollment—a failure that forced her withdrawal from the program, caused a life-threatening hospitalization (attached hereto as exhibit T), and destroyed her professional career trajectory.

4.    To obscure this liability, Defendants executed a coordinated "Administrative Pincer Maneuver" on September 30, 2025. This involved the simultaneous publication of a **VA OIG Audit Report 23-03328-197** (attached hereto as Exhibit K) establishing a narrative of "insufficient documentation" and the issuance of a backdated, individualized **Notice of Privacy Practices (IB 10-163)** (attached hereto as Exhibit J). This Notice was surgically back-calculated to July 31, 2025—the day immediately following the "end date of harm" documented in Plaintiff's October 1, 2025, refiled FTCA claim and administrative SF-95 for compensatory damages (attached hereto as Exhibit C)—in a transparent attempt to "fence off" the period of injury from the official record.

5.    This identity bifurcation seeks to strategically split the Plaintiff into two distinct digital identities intended to deprive her of Due Process: an "Injured" identity (October 16, 2023–July 30, 2025) that is archived and hidden by this Notice of Privacy Practices directive, and a "restored" identity (July 31, 2025–Present) manufactured to appear healthy. Defendants utilize the July 31st "eligibility renewal" as a Trojan Horse to create a digital severance, attempting to ensure the identity that suffered the $15.2M in damages has "no record," while the identity that *has* a record has "no injury."

6.    Throughout the period of harm, Plaintiff maintained a posture of meticulous documentation to ensure an accurate record. Despite Plaintiff's contemporaneous reports of acute symptoms—verified by the Defendants' own concurrent issuance of Penicillin-class prescriptions—Defendants knowingly submitted a fabricated "wellness" narrative to a United States Member of Congress on March 3, 2026. This clinical impossibility constitutes a fraudulent misrepresentation to the Legislative Branch designed to insulate the Defendants from oversight.

7.    The fraudulent nature of the "restored" record is further established by a "Register Clash" in the notes. While Plaintiff's clinical history contains professional terminology, the post-litigation entries contain non-clinical misspellings—specifically the misspelling of "abscess" as "abcess"—identifying these entries as administrative fabrications created by non-medical staff to support a litigation defense.

8.    As a direct result of these interconnected failures, Plaintiff seeks compensatory damages totaling $15,200,000 for gross medical and dental negligence, administrative omissions, Deprivation of Due Process, Intentional Infliction of Emotional Distress, and the destruction of her professional identity. Plaintiff further seeks emergency injunctive relief to halt the ongoing

2

manipulation of her records and an order allowing her to proceed under a pseudonym to protect her sensitive information from the stigma caused by these fraudulent records.

9.      All exhibits referenced herein are attached hereto and incorporated by reference as if fully set forth herein.

## JURISDICTION

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter arises under the Constitution and laws of the United States, specifically the Due Process Clause of the Fifth Amendment; the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1); the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; the Privacy Act, 5 U.S.C. § 552a; the Administrative Procedure Act ("APA"), 5 U.S.C. § 702; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. This Court further exercises supplemental jurisdiction over any related claims pursuant to 28 U.S.C. § 1367.

11.      Plaintiff's claims regarding the Veteran Readiness and Employment (VR&E) records do not constitute a 'benefits dispute' under **38 U.S.C. § 511(a)**. This Court has jurisdiction because:

(1) **Constitutional Due Process:** Plaintiff alleges a violation of her **Fifth Amendment property interest** in an accurate administrative record. Under *Cushman v. Shinseki*, the District Court retains jurisdiction over claims that the VA intentionally maintained or falsified a record to defeat a legal claim.
(2) **Administrative Fraud vs. Clinical Discretion:** Plaintiff is not challenging a medical diagnosis or a benefit rating. Plaintiff is challenging the falsification of data, specifically the July 31st backdating of the Notice of Privacy Practices and the administrative fabrication of 'wellness' notes containing non-medical misspellings (e.g., 'abcess') after a litigation hold was in place.
(3) **Spoliation and Record Integrity:** This action seeks relief for the tort of Spoliation and violations of the Privacy Act, over which the District Court has exclusive jurisdiction. 38 U.S.C. § 511 does not grant the VA immunity for committing record tampering during a pending Federal Tort Claims Act (FTCA) investigation.

## VENUE

12.      Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 552(a)(4)(B), as the Defendants are agencies of the United States and its officers acting in their official capacity, a substantial part of the events or omissions giving rise to the claims occurred in this District, and the records sought under FOIA are situated within the jurisdictional reach of this Court.

## PARTIES

13.      Plaintiff JANE DOE is a citizen of the United States and a resident of Woodbridge, Virginia, within the Eastern District of Virginia. Plaintiff is an honorably

discharged United States Marine Corps veteran with a 100% service-connected disability rating, including documented diagnoses of Level 1 Autism Spectrum Disorder (ASD), ADHD, and PTSD. Plaintiff is a member of a protected class under Section 504 of the Rehabilitation Act and a former participant of the VA Veterans Readiness & Employment (VR&E) program. Plaintiff's neurotype is characterized by acute attention to detail and a specialized aptitude for identifying structural inconsistencies and linguistic anomalies within clinical and administrative registers, which directly enabled the identification of the complex data non-congruency detailed herein. Plaintiff proceeds under a pseudonym to protect against irreparable professional stigma and the disclosure of sensitive psychiatric and neurological data.

14.     Defendant UNITED STATES OF AMERICA is the proper defendant for all claims brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1), as the negligent acts and omissions—including medical abandonment and administrative malpractice—were committed by employees of the Department of Veterans Affairs acting within the scope of their federal employment. The United States has waived sovereign immunity for these claims pursuant to 28 U.S.C. § 2674.

15.     Defendant DEPARTMENT OF VETERANS AFFAIRS ("VA") is an executive agency of the United States government. The VA is a proper defendant for all claims seeking injunctive, declaratory, and non-monetary relief under the Fifth Amendment to the U.S. Constitution, Section 504 of the Rehabilitation Act, the Freedom of Information Act ("FOIA"), the Privacy Act, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. The VA is responsible for the maintenance, integrity, and lawful adjudication of Plaintiff's medical and administrative records and is the entity responsible for the Deprivation of Due Process and record manipulation challenged in this action.

## FACTS

16.     Plaintiff is a disabled Marine Corps veteran who received medical and administrative services from the Department of Veterans Affairs. The tortious conduct giving rise to Plaintiff's FTCA claims began on October 16, 2023, and continued through July 2025. It was during this period that Plaintiff experienced delayed psychiatric care, delayed dental treatment for an active infection, and loss of educational opportunity and housing stability connected to VA actions and omissions. Plaintiff's enrollment in the VR&E program and the Au.D. doctoral program began in approximately April 2023, but the period from April through September 2023 was a period of successful academic performance during which Plaintiff achieved a 3.8 GPA and experienced no injury or adverse action by the VA. No FTCA claim accrued during this period because no tortious conduct had yet occurred and no injury had yet been sustained. Plaintiff's original SF 95 administrative claim identified October 18, 2023, as the start date of harm, referencing to when the Plaintiff's form psychiatrist signed the note into her VA health records, and her claims were timely filed within the two year limitations period under 28 U.S.C. § 2401(b).

17.     Plaintiff successfully completed her Bachelor of Science in Communication Disorders, the pre-professional degree program for the Doctor of Audiology (Au.D.) with honors (attached hereto as Exhibit W). A Doctorate of Audiology is a clinical professional doctorate specializing in the evaluation, diagnosis, and treatment of complex hearing and vestibular (balance) disorders. Plaintiff graduated from college with a 3.4 GPA while unmedicated for most of her undergraduate studies, as she was not officially diagnosed with ADHD by the VA until

4

July 2022, less than a year prior to her May 2023 graduation. This record demonstrates a high degree of raw cognitive resilience and superior human capital prior to entering the Au.D. program. To the extent the Defendants argue that Plaintiff's pre-doctoral medication regimen was adequate because it supported her completion of an undergraduate degree, such argument conflates two fundamentally different levels of academic demand. An undergraduate curriculum in Communication Disorders, while rigorous, does not require the sustained executive function, real-time clinical decision-making, or high-precision diagnostic reasoning demanded by a clinical doctoral program in the medical field. The non-stimulant medication that carried Plaintiff through her bachelor's degree was a baseline accommodation for undergraduate-level cognitive demand; it was never clinically evaluated or adjusted for the substantially greater neurological load of doctoral-level hard-science coursework, clinical rotations, and patient-safety responsibilities. The VA was aware that Plaintiff had transitioned from an undergraduate to a doctoral program and had a clinical obligation to reassess whether her existing medication regimen was adequate for the increased cognitive demands of that program. The substantially higher rigor of a clinical doctorate—requiring the synthesis of neuroanatomy and high-precision diagnostics—necessitated effective, gold-standard medication to maintain the executive function required for medical-level safety. The VA's refusal to provide this adjustment directly induced a mismatch between the Plaintiff's biological capabilities and her academic demands.

18.     Plaintiff's initial deferral in requesting stimulant medication was a result of institutional deterrence rather than a lack of need. Throughout the course of her two-year treatment relationship, Plaintiff's previous VA psychiatrist utilized fear-based counseling—labeling gold-standard stimulants as "highly addictive"— which induced a state of medical apprehension that persisted long after the provider relationship ended. This pattern of refusal began during Plaintiff's undergraduate studies, when Plaintiff reported that her prescribed Wellbutrin was not adequately managing her symptoms and requested a medication change. The psychiatrist refused, telling Plaintiff she did not need a modification. Plaintiff, having no clinical frame of reference for what effective ADHD treatment felt like and having ultimately graduated on the medication, accepted the provider's judgment. It was not until the substantially greater cognitive demands of the doctoral program that Plaintiff recognized her existing medication regimen was unsustainable for four years of clinical doctoral-level work. Plaintiff had already trialed both Strattera and Wellbutrin—the two primary non-stimulant ADHD treatment options—and both had proven inadequate. On October 16, 2023, at her final appointment with the outgoing VA psychiatrist, Plaintiff specifically requested stimulant medication—the clinically indicated next step after exhaustion of non-stimulant options. The psychiatrist refused and stated that the next provider would have to deal with it. He made no referral, initiated no warm handoff, and identified no replacement provider. Plaintiff relocated to Washington state in June 2023 and continued seeing this psychiatrist remotely until October 2023. After the October 16 appointment, Plaintiff's prescribed medications ran out in November 2023 with no provider to issue a renewal. Plaintiff was without psychiatric care or medication for approximately one month until she was assigned a new VA provider in December 2023. Upon meeting the new provider, Plaintiff knew she could not request stimulants at an initial appointment with a provider who had no established rapport with her, as such a request would risk being profiled as drug-seeking—a well-documented stigma within the VA system regarding ADHD stimulant regulation.

19.     Plaintiff therefore made the strategically responsible decision to request an increase in her Wellbutrin dosage as a conservative first step, with the intention of building

5

toward a stimulant conversation over subsequent appointments. VA psychiatric appointments were scheduled once per month, limiting the pace at which treatment could be adjusted. In approximately March 2024, Plaintiff discovered that her assigned provider did not have prescribing authority for stimulant medication. The months of rapport-building with this provider had been clinically meaningless for the one intervention Plaintiff actually needed. In May 2024, Plaintiff called the VA to inquire about seeing a psychiatrist with stimulant prescribing authority and was informed that the earliest available appointment was five months away, in September 2024—three months after her doctoral program would be academically unrecoverable. Plaintiff recognized that her academic trajectory could not survive until September and that she faced a choice between voluntary withdrawal to preserve her academic record or punitive academic dismissal. On June 14, 2024, Plaintiff withdrew (attached hereto as Exhibit W). Within 48 hours of Plaintiff's withdrawal, the VA authorized a qualified outside provider through its Community Care referral system—the same referral mechanism the VA used for Plaintiff's dental extraction under Count 7. This Community Care pathway was available throughout the preceding eight months and could have been used to refer Plaintiff to an outside psychiatrist with stimulant prescribing authority at any point—on October 16, 2023, when the outgoing psychiatrist refused to act, in December 2023 when the new provider was assigned, in March 2024 when Plaintiff discovered the prescribing limitation, or in May 2024 when Plaintiff was told to wait five months. The VA chose not to use it until 48 hours after Plaintiff's doctoral career was over.

20. Following the Plaintiff's transition to a provider who authorized the clinically appropriate stimulant medication, Plaintiff demonstrated her true academic baseline by completing her first semester of a Juris Master program at George Mason University in Fall 2025 with a 3.50 GPA (attached hereto as Exhibit W), while simultaneously earning a professional certificate in arbitration. Notably, Plaintiff achieved this while managing a full-time academic load alongside the significant executive function demands of investigating and prepping for litigation against the Defendants' administrative obstructions and record-keeping failures. This success serves as a direct clinical 'control,' proving that Plaintiff's prior academic collapse was the proximate result of the VA's failure to provide appropriate medication and support, rather than any inherent limitation of her ADHD or ASD.

21. At the conclusion of the Fall 2025 semester, once the immediate threat of homelessness, induced by the Defendants' administrative negligence—was stabilized, Plaintiff conducted an objective evaluation of her professional future. Plaintiff's prior enrollment in a Juris Master program was a tactical, survival-based necessity; following her forced withdrawal from the Au.D. program (attached hereto as Exhibit W), and the VA's subsequent failure to process her claims, Plaintiff lacked the documented income and administrative stability required to secure housing. The Juris Master program provided an immediate path to a living stipend through student loans during a period of acute institutional displacement at the conclusion of her lease in Bellingham, Washington on June 29, 2025, through an automatic housing pre-approval program in Woodbridge, Virginia for full-time graduate students. This tactical enrollment allowed Plaintiff to mitigate the immediate risk of homelessness while awaiting the restoration of her clinical and administrative stability. Following the enactment of Public Law 119-21, commonly referred to as the One Big Beautiful Bill Act (OBBBA) for federal student aid, signed into law July 4, 2025, and its looming July 1, 2026, statutory deadline, Plaintiff transitioned into a Master of Arts in Forensic Linguistics beginning on January 26, 2026, online through Hofstra University. This was the only specialized degree Plaintiff could reasonably begin with the

remaining OBBBA enrollment window, as her Bachelor of Science in Communication Disorders provided the requisite scientific foundation to perform at a graduate level immediately.

22.     This transition represents the Plaintiff's intentional effort to reclaim her identity as a scientist and expert in her field, while mitigating the total loss of the doctoral medical career the Defendants derailed. In addition to her graduate studies, Plaintiff has since obtained her Virginia Life & Annuities Producer license in March 2026 and is attempting to build an independent insurance sales career to generate immediate income while completing her degree. However, the license was obtained less than one month before the filing of this complaint, and because commission-based insurance sales requires the independent client acquisition, social networking, and relationship-building skills that Plaintiff's documented disabilities impair, the insurance license has not yet generated any income as much of her pursuits since her entire life derailed in October 2023. This licensure represents a further good-faith effort to mitigate the financial devastation caused by the Defendants' negligence. Plaintiff also enrolled in American Corporate Partners (ACP), a national nonprofit mentorship program that pairs veterans and active-duty military spouses with corporate professionals to provide personalized career guidance, professional networking, and structured employment support. Plaintiff sought out ACP independently because the VA's VR&E program—which was mandated to provide precisely this type of vocational transition support—had failed to do so, and even after the Defendants became aware of that failure, they have made no effort to rectify Plaintiff's professional stagnation, provide alternative rehabilitative assistance, or housing assistance since their knowledge of Plaintiff's social, financial, and professional challenges in the last year cause by their negligence. Plaintiff's enrollment in ACP represents yet another independent mitigation effort undertaken without institutional support from the Defendants, and further demonstrates Plaintiff's continuous, good-faith commitment to rebuilding a viable career trajectory despite the Defendants' abandonment of their statutory obligations.

23.     Plaintiff also completed a state-approved esthetician training program in Washington state over a year prior to this filing but remains unable to obtain licensure. Notably, Plaintiff enrolled in the esthetician program during her doctoral studies as a low-stress, part-time pursuit after her Au.D. clinical director instructed all students in the cohort to find an outlet outside of audiology to manage the demands of clinical doctoral training. Other students chose part-time employment, travel, or campus organizations. Plaintiff chose esthetics because it was a short program, low stress, and would result in a professional certification upon completion. The esthetician program was never intended as a career—it was a hobby and passion pursuit undertaken on the recommendation of a clinical supervisor. Over two years after completing the program, Plaintiff still does not have the certification. Multiple independent barriers prevent Plaintiff from converting this completed training into a credential. First, Plaintiff still owes an outstanding balance on the program that was not fully covered by her student loans, and she has not yet been able to pay it off given her current financial constraints. Second, Plaintiff's esthetician school in Washington will not release her transcripts until the outstanding balance is paid in full. Third, because Plaintiff relocated to Virginia, her Washington transcripts must be transferred and submitted for an evaluation process to determine whether they satisfy Virginia's licensure requirements—a process that takes several months. Fourth, even if the transcripts were released, transferred, and approved, Plaintiff would still need to complete months of dedicated preparation for the two-part licensure examination—a scientific theory exam and a practical examination on a mannequin—which she cannot undertake while simultaneously managing graduate coursework, federal litigation, and the ongoing demands of financial survival on a

limited income. Each of these barriers is independently sufficient to prevent licensure, and together they represent a multi-month, multi-step process that the Defendants' negligence has made functionally impossible to initiate. The esthetician credential represents yet another income-generating opportunity that the Defendants' conduct has foreclosed, not because Plaintiff lacks the training but because the Defendants' negligence has consumed both the financial resources and the executive bandwidth the licensing process requires. However, the gap between an insurance producer license—obtainable after a single state examination—and the Doctor of Audiology credential Plaintiff was on track to earn illustrates the permanent and irreversible reduction in professional trajectory the Defendants' conduct has caused.

24.    In March 2025, while navigating the academic and financial instability caused by the Defendants' prior omissions, Plaintiff suffered a dental emergency involving an active infection with excruciating pain. On April 28, 2025, Plaintiff made several calls to the Seattle Puget Sound VA Medical Center's Dental Clinic to receive an emergency referral for a dental provider. On April 29, 2025, Plaintiff drove 90 miles from Bellingham to the Puget Sound VA Medical Center for a walk-in emergency. Under VA Directive 1130.01, the VA is mandated to provide same-day emergency triage and treatment for patients presenting with acute pain or active infection. Despite having the clinical capacity to treat the infection, the Seattle VA Dental Clinic refused same-day treatment and instructed Plaintiff to return the following day for an extraction. Facing the prohibitive cost of a 180-mile round trip on a depleted budget, a state where fuel prices were priced at nearly $4.88 per gallon. Plaintiff declined the repeat burdensome drive, requesting a local Community Care referral. The VA's subsequent administrative delay left the Plaintiff with an untreated, painful infection for over three weeks. Plaintiff was forced to seek emergency care at non-VA urgent care centers twice for antibiotics while the VA Dental Clinic ignored her calls and did not respond to her voicemail messages. While the VA Community Care division was eventually able to get her consultation scheduled with an in-network provider, the consultation was not provided until May 20, 2025, nearly three weeks following the Plaintiff's initial drive to the Seattle VA Dental Clinic, and the extraction was not performed until May 28, 2025. This failure to provide timely emergency treatment for an active infection constituted a gross deviation from the standard of care and further depleted the Plaintiff's physical and financial reserves immediately preceding her June 2025 collapse.

25.    On May 16, 2025, Plaintiff filed two separate FTCA claims; one for dental negligence (attached hereto as Exhibit A) and the other an institutional harm claim (attached hereto as Exhibit B). The Plaintiff sent the VA OGC Torts Law Group a pre-emptive email that same afternoon to inform the office that both claims were in route via USPS and would be delivered in separate envelopes that Monday of May 19, 2025. On June 13, 2025, a VA OGC Torts Law Group legal assistant called Plaintiff and confirmed receipt of the dental negligence FTCA claim, verifying its docket number with Plaintiff over the phone (attached hereto as Exhibit D). When Plaintiff inquired about the status of her second claim, the legal assistant searched the system and could not locate it. After Plaintiff explained that she had mailed two separate FTCA claims in separate envelopes on the same date, the legal assistant conducted a further search and confirmed that the institutional   harm claim was not in the VA's system and may have accidentally been "lost or discarded." The legal assistant's search was not cursory—she had just confirmed the dental claim by docket number in the same system, demonstrating that the system was functioning and that claims properly logged were retrievable. The institutional   harm claim was simply not there. Plaintiff immediately followed up via email at the conclusion of the phone call to document what the legal assistant had disclosed. The VA

OGC Torts Law Group thereafter ceased all communication with Plaintiff. Despite multiple follow up emails and phone calls from Plaintiff regarding the missing claim, the VA did not respond to a single communication from June 13, 2025, through September 2025—a period of approximately three and a half months of total institutional silence. This silence began immediately after the legal assistant's disclosure that the institutional harm claim had not been logged and is consistent with an institutional decision to avoid further acknowledgment of the missing claim while the two year statute of limitations under 28 U.S.C. § 2401(b) continued to run. Plaintiff later realized that the unlogged claim was due to reach its two year statutory expiration just five months later, on October 16, 2025. On October 1, 2025, Plaintiff refiled the institutional harm claim at an increased amount of $15,000,000 to reflect the full scope of harm that had occurred since the original filing, including her emergency hospitalization (attached hereto as Exhibit T) on June 24, 2025. Moreover, upon acknowledging receipt, VA OGC represented that the original institutional harm claim had been delivered on May 20, 2025 (attached hereto as exhibit M). This representation is irreconcilable with the legal assistant's June 13, 2025, confirmation that the claim was not in the VA's system. If the claim was delivered on May 20, it should have been logged and visible in the system when the legal assistant searched on June 13—twenty four days later. It was not. The legal assistant had just confirmed the dental claim by docket number in that same system moments earlier, establishing that the VA's claims tracking system was operational and that properly received claims were retrievable. The institutional harm claim was not retrievable because it had not been logged.

26. The VA has thus placed itself in three mutually exclusive positions: (1) the claim was "lost or discarded" and did not exist in the system as of June 13; (2) the claim was delivered on May 20 and was in the VA's possession all along; and (3) the claim was only located and acknowledged after Plaintiff refiled at an increased amount in October. These positions cannot all be simultaneously true. Either the claim was received on May 20 and deliberately withheld from logging for nearly five months while the statute of limitations ran, or the May 20 delivery date was reconstructed after the fact to create the appearance that the claim had been in the VA's possession all along. Under either scenario, the VA failed to log, process, or acknowledge the claim at any point during the intervening months despite Plaintiff's repeated inquiries, and reversed its position only after Plaintiff refiled at $15,000,000. The VA's conduct is consistent with either the deliberate concealment of a validly received claim or the retroactive fabrication of a delivery record once continued denial of receipt was no longer tenable following Plaintiff's escalation.

27. The Defendants' administrative abandonment and failure to provide transitional support as required by VA Directive M28C forced the Plaintiff into a state of acute environmental instability, compelling her to conduct a 12-day solo cross-country relocation beginning June 30, 2025. This 2,000-mile relocation was necessitated by the Plaintiff's need to vacate her Washington residence and her tactical enrollment in a Virginia-based Juris Master program—the only immediate path to housing security following the Defendants' "loss" of her May 2025 harm claim. During this transit, the Plaintiff was forced to stop for extended periods as her disability stipend proved functionally insufficient to maintain the fuel and nourishment necessary for the journey. To facilitate the move, the Plaintiff was compelled to pawn essential educational tools, including her laptop and iPad, at a pawn shop in Olathe, Kansas. Upon arriving in Virginia on July 12, 2025, the Plaintiff was left with zero liquid capital, as her entire disability stipend for the month of July had been exhausted to pay for movers from Washington State to Virginia. This financial void left the Plaintiff in a period of profound physiological

depletion; too physically weak to travel to a shelter and lacking the funds for fuel to seek aid, she remained largely confined to her residence in a state of starvation throughout the remainder of July. This state of forced deprivation persisted until the subsequent August pay period, when the Plaintiff finally received the funds necessary to restore a regular food supply. This prolonged period of exposure and starvation was the direct, foreseeable result of the Defendants' administrative negligence and breach of their mandatory duty of care.

28.     On September 1, 2025, Plaintiff notified the VA OGC Torts Law Group of her intent to refile the missing claim (attached hereto as Exhibit U). On September 8, 2025, Plaintiff's congressional representative, EUGENE VINDMAN (VA-07), sought oversight and clarification from the VA regarding the status and handling of Plaintiff's FTCA claims. The VA did not respond to the Congressional inquiry for nearly six months. When the VA finally transmitted its response on March 3, 2026 (attached hereto as Exhibit F), the response contained the factual misrepresentations detailed in paragraphs 24 and 25 of this complaint—including the representation that Plaintiff "felt well" on a date the VA's own nurse documented chills, a cough, and an untreated infection, and the assertion that "no dental abscess was noted" when Plaintiff was never diagnosed with a dental abscess. The VA thus took nearly six months to respond to a congressional oversight inquiry and used that response to transmit clinically inaccurate representations that are contradicted by the VA's own contemporaneous medical records. Despite the lack of timely response to the congressional inquiry, Plaintiff's Privacy Act–protected information was accessed across VA divisions during this period, including by personnel outside the Office of General Counsel.

29.     The acute psychological and physiological toll of the Defendants' institutional negligence—specifically the 'lost' May 2025 claim and the lack of clinical support, resulted in the Plaintiff's physical collapse and emergency hospitalization (attached hereto as Exhibit T) on June 24, 2025. Plaintiff was treated for hypokalemia, renal strain, vertigo, severe dehydration, and a UTI with hematuria. This administrative neglect forced the Plaintiff into a state of clinical catabolysis (tissue cannibalization). This emergency occurred at 6:00 AM during a self-initiated, virtual professional mediation training course for the State of Virginia; a pursuit Plaintiff undertook independently after the VA abandoned her rehabilitation plan. The collapse occurred just 24 hours prior to certification, rendering Plaintiff unable to complete the training and eliminating her primary effort to mitigate damages.

30.     On September 30, 2025, one day prior to Plaintiff's formal October 1, 2025, refiling of her allegedly 'lost' claim—and exactly 29 days after Plaintiff notified the VA OGC Torts Law Group on September 1, 2025, of her intent to refile—the Defendants engaged in a series of contemporaneous administrative actions that had the effect of obscuring the preceding physical and institutional harm. First, the VHA Chief Privacy Officer, STEPHANIA GRIFFIN, issued an individualized **Notice of Privacy Practices (IB 10-163)** (attached hereto as Exhibit J), that was backdated to July 31, 2025 (one day after Plaintiff's original SF-95 end-date of harm) (attached hereto as Exhibit C) but postmarked for September 30, 2025.

31.     On the same day, the VA Office of Inspector General (OIG) published **VA OIG Audit Report 23-03328-197**, titled '**The Accuracy of Veteran Readiness and Employment Claims Cannot Be Assessed Because of Insufficient Documentation**' (attached hereto as Exhibit K). Notably, the audit's scope was restricted to April–September 2023, the exact window of Plaintiff's enrollment into the VR&E program and 3.8 GPA first quarter doctoral performance. Although the audit was facially framed as a blanket review of all veterans enrolled

in VR&E during that period, its practical effect was to cast doubt on the eligibility documentation of every veteran enrolled during the precise months of Plaintiff's participation. The VR&E program has operated continuously since 1943 under Chapter 31 of Title 38, yet the OIG selected a single six   month window out of over eighty years of program history to audit—and that window corresponds exactly to the period of Plaintiff's enrollment. The VA has offered no explanation for why this particular six   month period, rather than any other period in the program's eight-decade existence, was selected for review, nor why the audit was published on the day immediately preceding Plaintiff's refiling. The framing of an action targeting a specific claimant's enrollment window as a system-wide audit is the precise mechanism by which an agency could challenge a claimant's eligibility without the appearance of individual targeting. Plaintiff alleges these actions were a coordinated administrative maneuver designed to use the VA's own record-keeping failures as a post-hoc defense against the severe injuries and hospitalization sustained on June 24, 2025.

32.     In addition, on approximately November 4, 2025, Plaintiff received notification that the VA had transmitted documentation to the U.S. Department of Education's Federal Student Aid office initiating an automatic Total and Permanent Disability (TPD) discharge of Plaintiff's George Mason University federal student loans, which had been disbursed in August 2025. Plaintiff had not requested this discharge. Plaintiff had previously received a TPD discharge of student loans incurred during an earlier esthetician training program. Under 34 C.F.R. § 685.213 and applicable Department of Education regulations, when a borrower who has previously received a TPD discharge seeks to take out new federal student loans, the borrower must obtain a medical certification that the borrower is capable of substantial gainful activity and must sign a statement acknowledging that the new loans cannot be discharged on the basis of any injury or illness present at the time the new loans were made, unless the borrower's condition has substantially deteriorated. Plaintiff signed this certification and acknowledgment when she enrolled at George Mason University. The VA's initiation of a discharge of these post-acknowledgment loans was conducted without any medical review of whether Plaintiff's conditions had substantially deteriorated and without Plaintiff's request, in violation of 34 C.F.R. § 685.213(c)(2)(i). Plaintiff was actively enrolled in her graduate program at the time of the discharge notification with additional semesters remaining. Discharging one semester of loans from an incomplete degree program serves no practical benefit to the veteran, as future semesters generate additional loan obligations not covered by the discharge. Plaintiff declined the discharge. The initiation of this unsolicited discharge — transmitted by the VA to Federal Student Aid without medical review, without Plaintiff's request, and timed to arrive weeks after Plaintiff served a formal litigation hold notice on October 20, 2025 — is consistent with the pattern of unsolicited administrative actions timed to Plaintiff's claims activity documented throughout this complaint. The precise effective date transmitted by the VA to Federal Student Aid is the subject of a pending FOIA request.

33.     On October 5, 2025, Plaintiff submitted FOIA and Privacy Act requests seeking internal communications, metadata, mailing logs, and records related to her FTCA filings following these patterns of contradictions and irregularities (FOIA request and VA denial response attached hereto as Exhibit G). The VA responded with a follow-up letter via email on October 9, 2025, denying the release of the requested FOIA records, withheld all responsive pages, invoked exemptions without adequate justification, conducted a flawed search using an incorrect name without correction upon being brought to their attention, and failed to issue a timely determination or invoke the statutory extension. On October 17, 2025, Plaintiff filed a

11

timely FOIA appeal to the VA Office of General Counsel FOIA Appeals Team challenging the October 9 denial. On October 20, 2025, the VA acknowledged receipt of the appeal but responded with a legally deficient acknowledgment that violated 5 U.S.C. § 552(a)(6)(A)(ii) — specifically, rather than issuing a determination within the statutorily required 20 working days, the VA's response stated only that the appeal would be processed on a first-in-first-out basis and that it could not estimate when a determination would be rendered, constituting an unlawful attempt to indefinitely defer its statutory deadline obligations. The VA further failed to invoke the permissible 10-day statutory extension under unusual circumstances as required before any delay could be lawfully justified. Plaintiff subsequently sent a follow-up communication reminding the VA of its statutory deadline obligations. The VA ignored that communication entirely, failed to produce any responsive records, failed to produce the Vaughn index Plaintiff had expressly requested, and as of the date of this filing has issued no final determination on Plaintiff's timely appeal — a period far exceeding the statutory maximum even accounting for any permissible extension.

34. Plaintiff alleges that the VA engaged in arbitrary and capricious administrative conduct, including retroactive documentation, inaccurate recordkeeping, and failure to preserve or produce required records. Notably, the records Plaintiff sought under FOIA include the very mailing logs, intake records, and internal communications that would confirm or refute the VA's contradictory representations regarding the receipt and processing of Plaintiff's institutional harm claim. If the VA's October 2025 representation that the claim was delivered on May 20, 2025, is accurate, the mailing logs and intake records would reflect that delivery—and would also reveal why the claim was not logged into the system when the legal assistant searched on June 13. If the VA records its telephone communications with claimants, the June 13 call record would capture the legal assistant's confirmation of the dental claim by docket number and her contemporaneous statement that the institutional harm claim did not exist in the system. The VA's refusal to produce any of these records, its invocation of blanket exemptions without segregability analysis, and its failure to respond to Plaintiff's timely appeal are consistent with an effort to withhold the documentary evidence that would resolve the contradictions in the VA's own account. These events form the basis of Plaintiff's FTCA, FOIA, Privacy Act, Rehab Act, and APA claims.

35. On October 20, 2025, Plaintiff sent a formal litigation-hold notice to the Department of Veterans Affairs Office of General Counsel's Accreditation, Discipline, & Fees program, requesting immediate preservation of all records, metadata, and electronically stored information relevant to her FTCA claims and expressly requesting that the notice be routed to the appropriate OGC divisions (attached hereto as Exhibit H). The notice was received by the VA OGC officials which responded that Plaintiff had contacted the "wrong mailbox" and declined to route the notice, despite being a department within VA OGC and despite Plaintiff having copied the OGC FOIA division. Plaintiff immediately followed up to clarify that the Accreditation program's own published jurisdiction includes complaints involving misconduct by VA-accredited attorneys, that her notice fell within that scope, and that OGC had an obligation to forward the litigation hold internally. OGC again refused, providing no alternative routing or point of contact. Plaintiff sent two additional clarifying emails explaining that she had copied the OGC FOIA division in the initial email, that delivery was therefore sufficient, and that forwarding a legal notice is a routine nondiscretionary administrative function under federal preservation standards. Plaintiff further noted her background as a Marine Corps administrative specialist and explained that internal routing through Outlook and the Global Address List is

standard federal practice. OGC did not respond further. The VA's refusal to forward a properly submitted litigation-hold notice, despite actual receipt and multiple opportunities to comply, constitutes a procedural failure and does not relieve the agency of its preservation obligations.

36.     Following the formal service of the litigation-hold notice on October 20, 2025, Plaintiff made a deliberate and documented decision to cease informal email communication with the Defendants and to limit all further contact to formal legal channels. This decision was not an act of non-cooperation or bad faith. Rather, it was a reasonable, safety-based response to circumstances that caused Plaintiff to develop a legitimate concern for her personal security during the pendency of active litigation against the Defendants. To the extent the Defendants characterize Plaintiff's cessation of informal communication as evidence of non-cooperation or failure to engage, such characterization is directly contradicted by the record: Plaintiff continued to pursue all formal legal remedies available to her, including filing a congressional inquiry through Congressman VINDMAN (VA-07), formally refiling her institutional harm FTCA claim on October 1, 2025, serving a litigation-hold notice on October 20, 2025, filing a timely FOIA appeal on October 17, 2025, and ultimately filing the instant action. Plaintiff's engagement with formal legal processes was continuous and documented throughout; only informal, extrajudicial communication ceased, and only for documented safety reasons.

37.     Throughout the entirety of Plaintiff's FTCA claims process from May 2025 through September 2025, VA Office of General Counsel attorney MICHAEL CLARK, did not contact Plaintiff once, despite Plaintiff's repeated emails and phone calls from July through September 2025 seeking status updates on both her dental and institutional harm claims. VA OGC counsel's first contact occurred only after Plaintiff submitted her FOIA and Privacy Act requests on October 5, 2025 — the first formal legal action Plaintiff took following the VA's months of administrative silence. VA OGC counsel contacted Plaintiff a second time on or about October 21, 2025, following Plaintiff's timely FOIA appeal on October 17, 2025, and her service of a formal litigation-hold notice on October 20, 2025. On this second occasion, VA OGC counsel requested that Plaintiff submit formal medical documentation pertaining to her May 28, 2025, dental extraction, including x-rays and related dental records. This request was made even though the May 28 extraction was performed by a VA Community Care in-network provider whose records are required to be maintained within the VA's HealthShare Referral Manager (HSRM) system and were therefore already within the Defendants' custody, control, and access. The VA's own administrative failure to retrieve these records through the HSRM system — a non-discretionary duty pleaded in Count 5 and Count 7 is directly corroborated by its own counsel's informal request that Plaintiff supply documentation the VA was already obligated to possess (attached hereto as Exhibit L and M). The pattern of VA OGC counsel's communications is itself probative: five months of complete non-responsiveness to Plaintiff's outreach, followed by two reactive contacts occurring exclusively in the immediate aftermath of formal legal actions Plaintiff initiated. This pattern is consistent with strategic monitoring of Plaintiff's legal activity rather than good faith claims processing. Plaintiff did not respond to either informal outreach for re-engagement. The timing and nature of this contact, occurring within 48 hours of Plaintiff's litigation-hold notice, after five months of silence — caused Plaintiff to reasonably conclude that the request constituted an attempt to establish informal re-engagement following Plaintiff's safety-based decision to cease informal communication, and potentially to create a record of Plaintiff's non-responsiveness should she decline to comply. Plaintiff's decision not to respond was consistent with her documented safety-based communication boundary and did not constitute non-cooperation, as all formal legal channels remained open and active.

38.     On March 3, 2026, Plaintiff received at 9:39 AM a response from the Office of Congressman VINDMAN (VA-07) transmitting the VA's official written response to a congressional inquiry regarding Plaintiff's FTCA claims (attached hereto as Exhibit F). The VA's congressional response contained specific factual representations directly contradicted by the VA's own contemporaneous medical records. Specifically, the VA represented that "veteran reported that she otherwise felt well and required no over-the-counter medications for pain" as of May 21, 2025. However, the VA's own Same-Day Services primary care note authored on May 21, 2025 (documented in the VA's own contemporaneous medical records from that exact appointment), documents that Plaintiff reported a dry cough for three weeks, endorsed chills—a systemic infection symptom—and had been unable to obtain her prescribed Penicillin VK due to financial inability to pay out-of-pocket following her prior Augmentin expenditure and financial constraints. The May 21 nursing note further documents that Same-Day Services were activated specifically because Plaintiff had not yet obtained her prescribed antibiotic and remained untreated until the May 28, 2025 scheduled extraction. The VA's representation that Plaintiff "felt well" on May 21, 2025, is irreconcilable with its own provider's contemporaneous documentation from that exact appointment.

39.     The VA's congressional response further represented that "no dental abscess was noted" as of May 21, 2025. This representation is clinically inaccurate. Plaintiff's actual diagnosis, as documented by VA dentist MANVI KAUSHAL, MD on April 29, 2025, was K02.53—Symptomatic Irreversible Pulpitis with Normal Apical Tissues. Irreversible pulpitis is an infection and necrosis of the internal pulp tissue of the tooth requiring surgical intervention—either by root canal therapy or extraction, and is clinically, anatomically, and diagnostically distinct from an abscess. Antibiotics can temporarily suppress symptoms of irreversible pulpitis but cannot resolve the underlying condition; the internal pulp infection persists until surgical treatment regardless of antibiotic administration. The VA's expert therefore rebutted a condition Plaintiff was never diagnosed with, while failing entirely to address whether the 29-day delay in treating documented irreversible pulpitis met the applicable standard of care. Notably, the only abscess-related record remaining in Plaintiff's selectively preserved VA chart is a December 2024 ear abscess surgical consult—an entirely unrelated condition involving a different anatomical structure that'd already been treated by the VA, requested months before Plaintiff's dental emergency—suggesting the clinical mischaracterization in the denial letter was not inadvertent.

40.     Upon logging into her MyHealtheVet portal on the morning of March 3, 2026, following receipt of the congressional response, Plaintiff discovered that her VA Patient Summary records spanning five years—2021, 2022, partially 2023, partially 2024, and 2025, had been removed from her patient portal, with her summary record from the years 2020 and 2026 still intact, as they were before and after her documented period of harm. These five years correspond precisely and exclusively to the evidentiary record underlying both of Plaintiff's FTCA claims. Plaintiff immediately took timestamped screenshots documenting the absence of these records (attached hereto as Exhibit I). No routine administrative review of Plaintiff's internal VA records would have any effect on the patient-facing MyHealtheVet portal, as those systems operate independently. Plaintiff maintains timestamped photographic evidence of the deleted records, constituting direct visual evidence of real-time record manipulation occurring after the litigation hold notice was served, during the pendency of this litigation, and on the same day the VA transmitted its congressional response.

14

## COUNT 1 (FOIA, 5 U.S.C. § 552)

### *AGAINST DEFENDANT DEPARTMENT OF VETERANS AFFAIRS*

41.     JANE DOE repeats and re-alleges paragraphs 1 through 39 hereof, as if fully set forth herein.

42.     A proper FOIA request requires the agency to conduct an adequate search for responsive records, disclose all nonexempt records, and comply with statutory deadlines. Plaintiff submitted proper FOIA requests on October 5, 2025, seeking internal communications, metadata, mailing logs, and related records (Tracking No. 26-00002-GC; attached hereto as Exhibit G).

43.     The VA conducted a flawed FOIA search, issuing an agency decision using the Plaintiff's incorrect name (attached hereto as Exhibit N), failed to search all custodians and systems reasonably likely to contain responsive records, and withheld all responsive pages in full under Exemptions 5 and 6 without a segregability analysis. The VA also failed to provide a Vaughn index. Plaintiff filed a FOIA appeal on October 17, 2025 (attached hereto as Exhibit O). The VA acknowledged receipt of the appeal on October 20, 2025 (Case #178508; attached hereto as Exhibit P)—the same day Plaintiff served the formal Litigation Hold notice (attached hereto as Exhibit H)—putting the agency on simultaneous notice of its preservation and transparency obligations. Despite the 20workingday deadline expiring on November 18, 2025, the VA did not issue a determination and did not invoke the 10-day statutory extension, resulting in constructive exhaustion.

44.     The records withheld by the VA are directly relevant to Plaintiff's claims: the mailing logs and intake records would establish whether the VA received Plaintiff's institutionalharm FTCA claim on or about May 20, 2025, as the VA subsequently represented, and if so, why it was never logged into the system despite a docketnumberconfirmed search by the VA's own legal assistant on June 13, 2025. The internal communications would reveal whether VA personnel were aware of the claim's existence during the three and a half month period of institutional silence that followed. The VA's blanket withholding of these records, without segregability analysis and without a Vaughn index, deprives Plaintiff and this Court of the evidence necessary to evaluate the VA's contradictory representations. These facts satisfy the elements of a FOIA violation.

45.     Plaintiff lacks an adequate remedy at law.

46.     By reason of the foregoing, Plaintiff seeks an order compelling the VA to produce all improperly withheld records, a declaration that the VA violated FOIA, an order requiring the VA to conduct a lawful search, and an order requiring the VA to justify any future withholdings, plus costs.

## COUNT 2 (Rehabilitation Act § 504, 29 U.S.C. § 794)

### *AGAINST DEFENDANT DEPARTMENT OF VETERANS AFFAIRS*

47.     JANE DOE repeats and re-alleges paragraphs 1 through 45 hereof, as if fully set forth herein.

48.     The Defendants violated Section 504 of the Rehabilitation Act by discriminating against the Plaintiff on the basis of disability in programs or activities conducted by an Executive

agency. Specifically, Defendants failed to provide 'reasonable modifications' for Plaintiff's documented ADHD and ASD, resulting in a denial of 'program access' to VR&E and medical services. Plaintiff is a qualified individual with documented disabilities and was otherwise qualified to participate in and receive the benefits of VA healthcare and VR&E programs. Plaintiff's disabilities directly impaired her ability to navigate the VA's fragmented and unresponsive administrative processes without accommodations, and a non-disabled veteran in the same circumstances would not have experienced the same barriers to care. The VA was aware of Plaintiff's documented disabilities and failed to provide accommodations or modifications to its processes to ensure equal access. Before Plaintiff refiled her FTCA claim on October 1, 2025, the VHA Chief Privacy Officer mailed a Notice of Privacy Practices directive dated September 30, 2025 (attached hereto as Exhibit J), which appeared to retroactively adjust eligibility timelines relevant to her care. The letter arrived four days after its stated mailing date despite the short distance between Washington, D.C. and Woodbridge, Virginia, and did not follow the typical medical clearance or eligibility review procedures. The timing and retroactive effect of this action, combined with the VA's selective failure to log or process Plaintiff's institutional harm claim, interfered with Plaintiff's access to healthcare services and administrative remedies.

49.  Notably, Plaintiff mailed both her dental negligence FTCA claim and her institutional harm FTCA claim on the same date, May 16, 2025, in separate envelopes to the same VA OGC address (attached hereto as Exhibits A and B). The VA logged and acknowledged the dental claim but reported the institutional harm claim as "lost" or "accidentally discarded" despite actual notice of its delivery. The institutional harm claim—originally filed for $125,000—was the claim that documented the VA's broader course of institutional misconduct, including psychiatric negligence, administrative abandonment, and the systemic failures underlying Plaintiff's deteriorating condition. It was this claim, not the narrower dental claim, that disappeared. At the time the VA reported it lost, that claim was approximately five months from its two year statutory expiration under 28 U.S.C. § 2401(b)—a deadline that, if missed, would have permanently barred Plaintiff from litigating the VA's institutional negligence in federal court or receiving any FTCA compensatory relief for it. It was only after the VA's negligent handling of that claim contributed to Plaintiff's emergency hospitalization (attached hereto as Exhibit T) and after Plaintiff discovered the pattern of administrative obstruction that the scope and damages of the institutional harm claim increased to reflect the full magnitude of the harm the VA's conduct had caused. The selective loss of the claim documenting the VA's most damaging institutional conduct—while the narrower dental claim mailed in the same shipment was processed without issue—is not consistent with random administrative error and supports an inference of discriminatory treatment of a disabled veteran's claims. These actions resulted in constructive exclusion from VA programs and caused physical harm through the denial of medical services and significant emotional distress arising from that harm.

50.  A non-disabled veteran facing identical administrative circumstances would not have experienced the same inability to navigate the VA's fragmented and unresponsive processes, as the executive function deficits, communication processing differences, and administrative navigation barriers documented in Plaintiff's disability profile are specific to her ASD and ADHD diagnoses and are not barriers experienced by neurotypical veterans.

51.  Plaintiff lacks an adequate remedy at law.

52.     By reason of the foregoing, Defendants are liable in an amount to be determined at trial, plus costs. Plaintiff seeks injunctive and declaratory relief requiring the VA to cease discriminatory practices, restore accurate eligibility records, ensure nondiscriminatory access to healthcare and administrative processes, and implement procedures that comply with the Rehabilitation Act. Plaintiff also seeks compensatory damages for the physical and emotional harm resulting from the VA's discriminatory interference with her access to medical services and the consequential deterioration of her physical condition.

## COUNT 3 (Privacy Act — Record Integrity, 5 U.S.C. § 552a)

### AGAINST DEFENDANT DEPARTMENT OF VETERANS AFFAIRS

53.     JANE DOE repeats and re-alleges paragraphs 1 through 51 hereof, as if fully set forth herein.

54.     The VA willfully and intentionally failed to maintain its records with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness to the Plaintiff, in violation of 5 U.S.C. § 552a(e)(5). This failure is evidenced by the VA reporting Plaintiff's May 16, 2025, institutional-harm FTCA claim as "lost" or "accidentally discarded" despite actual notice of its delivery, and by the creation and issuance of a fabricated federal document—specifically, a Notice of Privacy Practices directive (attached hereto as Exhibit J) bearing a date of July 31, 2025, but not postmarked until September 30, 2025, 61 days after its stated date. The July 31 date was not selected arbitrarily; it falls one day after Plaintiff's original SF 95 end-date of harm, and the letter was postmarked one day before Plaintiff's October 1 refiling.

55.     The letter was signed by VHA Chief Privacy Officer STEPHANIA GRIFFIN, a barred attorney, who would have understood the legal significance of the date assigned to a federal administrative document. The creation of a federal record bearing a fabricated effective date—designed to establish a post-harm eligibility period that did not exist at the time the document purports to have been issued—constitutes a willful failure to maintain accurate records and a deliberate corruption of the agency's record-keeping integrity. No intervening administrative event, regulatory trigger, or eligibility change occurred on July 31, 2025, that would have required the issuance of a new Notice of Privacy Practices on that date. The VA has offered no explanation for why the letter was dated July 31 but not mailed until September 30, nor has the VA identified any legitimate basis for the July 31 effective date. The backdated letter is consistent with the pattern of post-hoc administrative actions documented in paragraph 19 of this complaint and was designed to create a retroactive record that would support the agency's defense against Plaintiff's pending FTCA claims. As a proximate result of these willful failures to maintain accurate records, Plaintiff suffered adverse effects, including the procedural obstruction of her claims, the corruption of the administrative record underlying her eligibility determinations, and severe emotional distress arising from the physical harm caused by Defendants' willful interference with Plaintiff's medical care and records. Plaintiff is entitled to actual damages in an amount to be determined at trial, but in no case less than the statutory minimum of $1,000, plus reasonable attorney fees and costs.

17

56.     Plaintiff lacks an adequate remedy at law.

57.     By reason of the foregoing, Plaintiff seeks actual damages in an amount to be determined at trial, plus costs. Plaintiff additionally seeks injunctive and declaratory relief requiring the VA to correct inaccurate records, cease the creation of retroactive or fabricated federal documents, and maintain Plaintiff's Privacy Act–protected information in compliance with 5 U.S.C. § 552a. Plaintiff also seeks compensatory damages for the physical and emotional harm resulting from the VA's willful and intentional failure to maintain accurate records and its creation of a fabricated federal document bearing a backdated effective date.

## COUNT 4 (APA, 5 U.S.C. § 706)

### *AGAINST DEFENDANT DEPARTMENT OF VETERANS AFFAIRS*

58.     JANE DOE repeats and re-alleges paragraphs 1 through 56 hereof, as if fully set forth herein.

59.     The Administrative Procedure Act ("APA") requires this Court to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Furthermore, the Privacy Act requires federal agencies to maintain all records used to make determinations about an individual with such "accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness." 5 U.S.C. § 552a(e)(5).

60.     Defendants committed a "Substantive Fraud" upon the Plaintiff's administrative record by executing a coordinated "Administrative Pincer Maneuver" designed to neutralize Plaintiff's legal claims. This maneuver involved the simultaneous issuance of **VA OIG Audit Report 23-03328-197** and a back-calculated **Notice of Privacy Practices (IB 10-163)** on September 30, 2025.

61.     Defendants utilized the "Individualized" Notice of Privacy Practices to strategically bifurcate the Plaintiff's legal identity. By setting a retroactive effective date of July 31, 2025—exactly one day after the Plaintiff's documented period of harm—Defendants created a "procedural fence" intended to archive the injured Plaintiff while applying expanded data-manipulation authorities to the "current" record. This bifurcation provided the pretext for the March 3, 2026, data suppression event, wherein Plaintiff's patient portal records were removed and subsequently "restored" with fraudulent, manually entered clinical notes.

62.     Evidence of this manual manipulation is documented by a Forensic Orthographic Signature. Specifically, the "restored" records contain the misspelling of the clinical term "abscess" as "abcess," a human typographical error that does not occur in automated system updates. Furthermore, these "restored" records created a "Pharmacological Paradox" by claiming Plaintiff "felt well" and requested no treatment on the exact date Defendants were mailing a high-dose prescription of **500mg Penicillin** to treat an active, emergency infection.

63.     Defendants' actions in back-calculating privacy dates to match litigation filings, manufacturing a false "wellness" narrative during a medical crisis, and utilizing internal audits to "mask" record manipulation are arbitrary, capricious, and constitute a willful failure to maintain record accuracy under the Privacy Act.

18

64.     The VA's simultaneous publication of **OIG Audit Report 23-03328-197** on September 30, 2025—one day prior to Plaintiff's formal refiling—constitutes a pretextual, post-hoc administrative maneuver designed to utilize the agency's own record-keeping failures as a defense. Furthermore, pursuant to the standard established in **Hamill v. Collins, No. 24-1543 (Fed. Cir. Feb. 4, 2026),** the VA violated 5 U.S.C. § 706(2)(D) by failing to provide the explicit, statutory notice required by the Appeals Modernization Act (AMA). By substituting a generalized, retroactive audit for the individualized notice required under the AMA, Defendants attempted to bypass the 'Notice and Process' protections afforded to Veterans, effectively withholding agency action and unreasonably delaying the adjudication of Plaintiff's vocational claims in violation of 5 U.S.C. § 706(1).

65.     Plaintiff lacks an adequate remedy at law.

66.     By reason of the foregoing, Plaintiff seeks injunctive and declaratory relief under 5 U.S.C. § 706, including orders requiring the VA to cease arbitrary and retroactive procedural practices, correct inaccurate or incomplete records, comply with statutory and regulatory requirements, and provide Plaintiff with meaningful access to agency processes. Plaintiff also seeks a remand with instructions requiring the VA to reconsider the affected matters under lawful, non retroactive procedures. No monetary damages are sought under this Count.

## COUNT 5 (FTCA — Administrative Negligence)
### *AGAINST DEFENDANT UNITED STATES OF AMERICA*

67.     JANE DOE repeats and re-alleges paragraphs 1 through 65 hereof, as if fully set forth herein.

68.     Under the FTCA, the VA owed Plaintiff a duty to provide timely and clinically appropriate care, as well as a non-discretionary duty under VA Handbook 5975.1 to conduct administrative tasks — including record retrieval and claim logging — with reasonable care. The VA breached these duties through an interconnected series of failures, including the loss of the May 2025 institutional-harm claim, the issuance of backdated letters, and the negligent failure to utilize the HealthShare Referral Manager (HSRM) system to retrieve dental records, which shifted the burden of record retrieval to the disabled Plaintiff just weeks before the six-month FTCA claims decision deadline, despite ignoring all Plaintiff's prior attempts at communication since June 13, 2025. These negligent clerical and administrative omissions were the proximate cause of Plaintiff's physical deterioration resulting in emergency hospitalization (attached hereto as Exhibit T), and the consequential forced displacement, financial devastation, loss of professional certification, and severe emotional distress arising from those physical injuries and compounded by the VA's willful obstruction of Plaintiff's administrative and legal remedies through selective tampering, manipulation, and suppression of her medical records.

69.     By reason of the foregoing, Defendants are liable in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), plus costs. Plaintiff seeks compensatory damages for the physical deterioration and emergency hospitalization (attached hereto as Exhibit T) proximately caused by the Defendants' interconnected clerical and administrative failures, and for the following harms arising from and consequential to those physical injuries: (1) the forced 12-day solo cross-country relocation beginning June 30, 2025, undertaken in a state of documented physical depletion; (2) the period of food insecurity and starvation throughout July 2025, during which Plaintiff was confined to her residence without adequate funds for food or transportation, compounding her physical deterioration; (3) the compelled liquidation of essential

19

educational equipment, including Plaintiff's laptop and iPad, at a pawn shop in Olathe, Kansas; (4) the loss of Virginia state mediation certification, which collapsed 24 hours before completion on June 24, 2025, as a direct result of Plaintiff's emergency hospitalization; (5) severe emotional distress arising from the physical injuries and their aftermath, compounded by the VA's willful obstruction of Plaintiff's administrative and legal remedies through the selective deletion, manipulation, and suppression of her medical records; and (6) costs and such further relief as the Court deems just and proper.

### COUNT 6 (FTCA — Psychiatric Negligence)
#### *AGAINST DEFENDANT UNITED STATES OF AMERICA*

70.     JANE DOE repeats and re-alleges paragraphs 1 through 68 hereof, as if fully set forth herein.

71.     Under the FTCA, the VA owed Plaintiff a duty to provide timely, adequate, and clinically appropriate psychiatric care consistent with accepted medical standards. The VA breached this duty through an interconnected series of failures spanning October 2023 through June 2024. The VA's obligation to reassess Plaintiff's medication was heightened by her transition from undergraduate to doctoral-level study, which imposed substantially greater demands on the executive function and sustained cognitive focus that ADHD medication is prescribed to support. That Plaintiff's prior non-stimulant regimen had been sufficient for undergraduate coursework did not relieve the VA of its duty to evaluate whether that regimen remained clinically appropriate for the materially different cognitive demands of a clinical doctorate in the medical field. Plaintiff had already exhausted both primary non-stimulant treatment options—Strattera and Wellbutrin—and on October 16, 2023, specifically requested stimulant medication from her outgoing VA psychiatrist as the clinically indicated next step. The psychiatrist refused and stated that the next provider would have to deal with it, making no referral and initiating no warm handoff. The VA then assigned Plaintiff to a replacement provider who, as Plaintiff discovered in approximately March 2024, lacked prescribing authority for stimulant medication—rendering months of treatment with that provider clinically meaningless for the intervention Plaintiff required. When Plaintiff contacted the VA in May 2024 to request an appointment with a psychiatrist who could prescribe stimulants, she was informed the earliest available appointment was September 2024—three months after her doctoral program would be academically unrecoverable.

72.     At no point during this eight-month period did the VA offer to refer Plaintiff to a Community Care provider with stimulant prescribing authority, despite the VA's demonstrated ability to make such referrals as evidenced by the Community Care dental referral under Count 7 and the outside psychiatric provider the VA authorized within 48 hours of Plaintiff's June 14, 2024, withdrawal (attached hereto as Exhibit W). This breach directly caused documented physical and neurological injury to Plaintiff's executive function and cognitive baseline, resulting in Plaintiff's academic decline, including a severe and documented decrease in grade point average that was inconsistent with her established academic history, and contributed to the abrupt loss of her housing allowance without transitional support or wellness check. Plaintiff's VR&E counselor informed her that nothing could be done in circumstances like those, despite VA M2AC.V.A.2 Case Management Assistance having strict protocols for veterans in the VR&E program who are unable to continue enrollment in the program to establish procedural safeguards against abrupt termination (attached hereto as Exhibit V). These injuries were the

foreseeable result of the VA's negligent acts and omissions in managing Plaintiff's psychiatric care.

73.    By reason of the foregoing, Defendants are liable in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), plus costs. Plaintiff seeks compensatory and compensatory damages for the documented physical and neurological injuries proximately caused by the Defendants' psychiatric negligence — specifically, the clinically documented alteration of Plaintiff's neurological functioning and the resulting depletion of the executive function and cognitive bandwidth required to perform the intensive hard-science research and clinical diagnostics training fundamental to an Au.D. program.

74.    Specifically, the Defendants' failure to provide clinically appropriate stimulant medication for nearly a year — caused a severe and clinically documented physical alteration of Plaintiff's neurological functioning. The state of prolonged survival mode forced upon Plaintiff by Defendants' negligence has fundamentally and physically altered her cognitive baseline as documented in the VA's own records, rendering the pursuit of licensed clinical doctoral practice no longer viable within the timeframe and circumstances in which it was possible. Given the unique neuro-cognitive demands of a clinical doctorate for an individual with ADHD and ASD, this was a singular, non-replicable opportunity — not merely a career path but the one structured professional environment specifically designed for Plaintiff's neuro-cognitive profile, requiring the precise executive function and sustained clinical focus that Defendants' negligence depleted and disrupted at the most critical juncture of Plaintiff's academic trajectory.

75.    The Defendants' negligence destroyed Plaintiff's Plan A professional trajectory — a structured, clinical doctoral path in the medical field designed for her neuro-cognitive profile — and forced her into Plan B fields at a lower degree attainment level, from a clinical doctorate to a master's degree program, representing a permanent and irreversible reduction in both professional credential ceiling and the structured clinical vocational pathway for which Plaintiff trained, qualified, and was uniquely suited. Plaintiff's current academic success in the legal field and forensic linguistics represents the maximum extent of her mitigation efforts — a good-faith attempt to rebuild a professional trajectory following the VA's destruction of her doctoral career. Plaintiff has further mitigated her damages by obtaining a Virginia Life & Annuities Producer license in March 2026 and launching an independent insurance sales career to generate immediate income. That Plaintiff, a veteran who was pursuing a clinical doctorate in the medical field—is now selling life insurance to survive is itself evidence of the magnitude of the harm. The credential gap between a state insurance producer license, requiring only a single examination, and the Doctor of Audiology, requiring four years of post-baccalaureate clinical doctoral training with national board certification, quantifies the permanent downward displacement the Defendants' negligence has caused. However, the physical, cognitive, and neurological toll of two years of institutional negligence, survival-mode functioning, emergency hospitalization (attached hereto as Exhibit T), forced displacement, and administrative trauma has depleted the stamina and executive bandwidth required to pursue another four-year clinical doctoral program from the beginning. Plaintiff would face starting over entirely — new prerequisites, new cohort, new clinical rotations — without the institutional support, financial stability, or neurological reserves that made the original Au.D. trajectory viable.

76.    The VA's negligence did not merely delay Plaintiff's doctoral career. It consumed the resources required to rebuild it. The magnitude of the professional displacement is best understood by comparing the career trajectory Defendants destroyed with the reality they

created. The Doctor of Audiology is a structured, clinically supervised, four-year doctoral program with a defined curriculum, institutional mentorship, a built-in professional network, board certification, and a clear pathway to stable, high-income clinical employment upon graduation. That structured pathway was specifically designed for the kind of sustained, guided professional development that individuals with ADHD and ASD thrive in. In its place, Plaintiff is now navigating a fragmented professional existence consisting of an online, project-based master's degree completed in isolation without the peer cohort or institutional networking that residential programs provide; a commission-based insurance sales career with no guaranteed income, no employer-provided benefits, and no professional mentorship; an incomplete esthetician licensure she cannot finish because the demands of litigation and survival have consumed her available executive function; and the constant search for additional income streams to supplement a $3,967 monthly disability stipend that does not cover basic living expenses in Northern Virginia. Each of these pursuits requires Plaintiff to independently build professional relationships, generate her own client base, and market her own services—skills that are disproportionately difficult for an individual with ADHD and ASD, whose documented disabilities specifically impair the executive function, social networking capacity, and sustained self-directed initiative that unstructured, entrepreneurial career paths demand. The Defendants replaced a stable, structured doctoral career with a collection of unstable, unstructured side pursuits that are antithetical to Plaintiff's neuro-cognitive profile—and then left her to navigate them alone, without the vocational rehabilitation support the VA was mandated to provide. The result is not theoretical.

77.    Despite Plaintiff's documented academic achievements, professional certifications, and licensure, none of these pursuits have generated income. Plaintiff's ADHD and ASD produce a functional social paralysis that impairs her ability to build the professional relationships, client networks, and self-promotional presence that unstructured, commission-based, and freelance career paths require to produce revenue. The Doctor of Audiology program would have provided institutional placement, clinical rotations with built-in patient referral pipelines, board certification with employer-recognized credentials, and a structured professional network—none of which require the independent social initiative that Plaintiff's disabilities impair. Every alternative career path the Defendants' negligence has forced Plaintiff into demands precisely the capacities her documented disabilities diminish, resulting in a growing collection of credentials that Plaintiff cannot convert into income. As of the date of this filing, not one of the professional pursuits Plaintiff has undertaken since the VA derailed her doctoral career has generated any income. The insurance license, obtained less than one month before this filing, has produced no commissions. The esthetician certification remains incomplete. The forensic linguistics degree is in progress. The arbitration certificate has not led to employment, as arbitration is a profession that relies predominantly on established professional networks and referral relationships rather than credentialing alone, and Plaintiff lacks any professional connections in the Washington, D.C. metropolitan area who could facilitate entry into the field.

78.    Plaintiff has independently enrolled in American Corporate Partners (ACP), a national nonprofit veteran mentorship program, in an effort to obtain the structured career guidance and professional networking that the VA's VR&E program was mandated but failed to provide. The Virginia state mediation certification—which Plaintiff pursued independently after the VA abandoned her rehabilitation plan—was lost when Plaintiff was hospitalized less than 24 hours before completing the training, a hospitalization directly caused by the physical deterioration resulting from the VA's failure to provide post-withdrawal transitional support

22

following the abrupt termination of Plaintiff's VR&E housing stipend. None of these were career paths Plaintiff chose—they are survival measures forced upon her by the Defendants' destruction of the structured doctoral career she spent five years of formal education working toward.

79.     The Defendants' course of negligent conduct has further compounded Plaintiff's injuries by destroying her ability to access the mental health treatment necessary to recover from the crippling psychological harm they've caused. Plaintiff's primary healthcare provider is the VA—the same institution that betrayed her trust through the course of conduct documented in this complaint. As a result, Plaintiff is unable to engage openly with VA therapists about the full scope of her psychological deterioration, including the social anxiety that now impairs her professional functioning, because doing so requires trusting the institution responsible for her injuries. Plaintiff cannot afford private therapy on a $4,078 monthly disability stipend in Northern Virginia. The result is that Plaintiff has no therapeutic outlet and manages the cumulative psychological toll of two years of institutional harm, administrative misconduct, and litigation stress without professional support. The VA's conduct has thus created a self-reinforcing cycle: the institution caused the trauma, the trauma requires treatment, the institution is the treatment provider, and the institution's misconduct has rendered its own treatment inaccessible to the patient it harmed. Plaintiff further seeks compensatory damages for the loss of the enjoyment of life, the destruction of her professional identity as a prospective Doctor of Audiology, and the documented physical alteration of her cognitive baseline proximately caused by Defendants' two-year course of negligent psychiatric care.

## COUNT 7 (FTCA — Dental Negligence)

### AGAINST DEFENDANT UNITED STATES OF AMERICA

80.     JANE DOE repeats and re-alleges paragraphs 1 through 78 hereof, as if fully set forth herein.

81.     Under the FTCA, the VA owed Plaintiff a duty to provide timely, adequate, and clinically appropriate dental care, including emergency treatment for active oral disease as required by VHA Directive 1130 Appendix (b)(4), 38 U.S.C. §§ 1710(a)(1), 1712(a)(1)(G), and 38 C.F.R. §§ 17.160–17.166 and 17.38(b). The VA breached this duty through an interconnected series of failures spanning April through May 2025.

82.     On April 28, 2025, Plaintiff made multiple documented calls to the Seattle Puget Sound VA Medical Center Dental Clinic seeking emergency care for acute dental pain. Plaintiff was unable to reach a provider after sustained attempts, including a 34-minute hold and multiple dropped calls. Plaintiff was forced to seek emergency care at PeaceHealth Priority Care in Bellingham, Washington, where provider FRANK P. FADER, PA-C diagnosed a possible dental infection and prescribed Amoxicillin-Clavulanate 875-125mg for seven days. Plaintiff filled this prescription out of pocket at Walgreens for $21.96 (attached hereto as Exhibit R), as the VA had failed to provide any care or referral.

83.     On April 29, 2025, Plaintiff drove 90 miles to the Seattle VA Medical Center for a walk-in dental emergency. VA dentist MANVI KAUSHAL, MD diagnosed Plaintiff with K02.53 — Symptomatic Irreversible Pulpitis with Normal Apical Tissues — an internal pulp infection requiring surgical intervention that cannot be resolved by antibiotics alone. Despite this diagnosis of an active, irreversible infection, the VA prescribed no medication whatsoever, as explicitly documented in the April 29 medication reconciliation note stating no medications were

changed, prescribed, or administered. The VA referred Plaintiff to Community Care for extraction rather than providing same-day emergency intervention as required by VHA Directive 1130.01.

84.     Irreversible pulpitis is clinically, anatomically, and diagnostically distinct from a dental abscess. It represents an infection and necrosis of the internal pulp tissue of the tooth that persists regardless of antibiotic treatment until surgical intervention is performed. The VA's failure to prescribe any medication on April 29 despite diagnosing an active irreversible infection constituted a gross deviation from the standard of care.

85.     The treatment prescribed by PeaceHealth expired on May 5, 2025. On May 13, 2025, with the infection persisting after the completed antibiotic course, Plaintiff presented to the PeaceHealth Emergency Room with continued dental pain and a new cough. The ER prescribed antibiotics for seven days and ordered a chest X-ray due to Plaintiff's shortness of breath. Plaintiff was unable to fill the prescription out of pocket due to the significant financial burden circumstances she'd been enduring.

86.     The VA's January 2, 2026, response to the congressional inquiry referenced the denial of Plaintiff's dental FTCA claim (attached hereto as Exhibit E) and asserted that "no dental abscess was noted" as of May 21, 2025. This representation is clinically inaccurate. Plaintiff was never diagnosed with a dental abscess. Her diagnosis was K02.53 irreversible pulpitis. The VA's expert rebutted a condition Plaintiff was never diagnosed with while failing entirely to address whether the 29-day delay in treating documented irreversible pulpitis met the applicable standard of care. The Community Care consultation was not provided until May 20, 2025, and the extraction was not performed until May 28, 2025 — 29 days after the VA's own dentist diagnosed an active, irreversible infection requiring surgical intervention.

87.     By reason of the foregoing, Defendants are liable in the amount of Two Hundred Thousand Dollars ($200,000), plus costs. Plaintiff seeks compensatory damages for the physical injury and avoidable pain and suffering sustained during the 29-day delay between diagnosis and extraction of an active irreversible infection, financial harm including out-of-pocket prescription costs and emergency care expenses, emotional distress arising from the prolonged untreated physical condition, and the systemic physical consequences of the untreated infection including the symptoms documented at the May 13 ER visit and May 21 follow-up assessment.

## COUNT 8 (FTCA — VR&E Professional Negligence)

### AGAINST DEFENDANT UNITED STATES OF AMERICA

88.     JANE DOE repeats and re-alleges paragraphs 1 through 86 hereof, as if fully set forth herein.

89.     Plaintiff brings this claim for Professional Negligence under the Federal Tort Claims Act (FTCA). This is not a challenge to a benefits determination, but a claim for damages resulting from the negligent performance of mandatory administrative duties by VR&E staff. Specifically, the VR&E counselor breached the mandatory 'duty of care' established by VA Directive M28C by failing to provide required transitional planning, which compounded the physical and neurological injuries described herein and proximately caused Plaintiff's 'Total Loss of Lifetime Earning Capacity'. The VR&E counselor's breach of mandatory duties under VA Directive M28C specifically includes a failure to provide the 'Individualized Employment Assistance' required to bridge the gap between academic training and gainful employment. This

24

omission is the proximate cause of the Plaintiff's economic stagnation; while she has achieved documented academic performance, she remains unemployable to a new professional market without the structured vocational support, rehabilitative trauma therapy to address the functional agoraphobia and physical depletion resulting from the VA's negligence, network-building assistance, or transitional stability mandated by law. This failure has transformed her intellectual high-performance into an unmonetizable asset, resulting in a total loss of lifetime earning capacity arising from the physical and neurological injuries inflicted by Defendants' interconnected course of negligent conduct. To the extent the Defendants rely on **VA OIG Audit Report 23 03328 197** (attached hereto as Exhibit K) to suggest that Plaintiff's VR&E enrollment cannot be verified or that M28C duties did not attach, such reliance is unavailing. Prior to enrollment, Plaintiff underwent a formal eligibility evaluation and interview conducted by VR&E staff to determine whether she met the criteria for participation in the program. The VA made an individualized determination that Plaintiff qualified, and on that basis accepted Plaintiff into the VR&E program, assigned her a Vocational Rehabilitation Counselor, approved her doctoral rehabilitation plan, provided a housing allowance, and supervised her academic performance throughout her enrollment—during which Plaintiff achieved a 3.8 GPA.

90.     Having assessed Plaintiff's eligibility, accepted the benefit of her participation, and exercised ongoing supervisory authority over her rehabilitation plan, the VA cannot retroactively disclaim the mandatory duties that attached to that enrollment. The M28C duties arose upon enrollment and remained in effect throughout Plaintiff's participation regardless of whether the VA's own internal documentation met the standards the OIG subsequently identified. Specifically, M28C.V.A.2 Case Management Assistance imposes mandatory documentation and follow-up obligations on VR&E counselors using the word 'must' throughout, including the requirement to document any reported issues affecting the claimant's ability to complete planned objectives, any plan of actions to address identified difficulties, follow-up with claimants whose cases are placed in Discontinued status, and outcomes of employment assistance and follow-up actions. These are not discretionary judgment calls — they are mandatory administrative duties that the discretionary function exception does not protect. The VR&E counselor's failure to perform these specific mandatory duties upon Plaintiff's program discontinuation is the precise breach alleged in this Count.

91.     Moreover, the audit's publication on September 30, 2025—one day before Plaintiff's October 1, 2025, refiling of her institutional   harm claim, with a scope restricted precisely to the window of Plaintiff's VR&E enrollment—supports an inference that the audit was published not as a genuine exercise of oversight authority but as a preemptive defense against Plaintiff's pending claims, as more fully alleged in Count 4. That the audit was facially styled as a blanket review of all VR&E veterans enrolled during April through September 2023 does not negate this inference; to the contrary, framing a targeted action as a system-wide audit is the precise mechanism by which an agency could challenge a specific claimant's enrollment without the appearance of individual targeting. The VR&E program has operated continuously since 1943, yet the OIG selected a six   month window out of over eighty years of program operations that corresponds exactly to Plaintiff's enrollment period. No explanation has been offered for this selection. To the extent the Defendants attempt to use the audit's April–September 2023 scope to argue that Plaintiff's harm accrued during the enrollment period and is therefore time   barred under 28 U.S.C. § 2401(b), such argument is meritless. The April through September 2023 period was a period of successful academic performance during which Plaintiff achieved a 3.8 GPA under the VA's supervision and experienced no injury. Enrollment

in a program is not an injury. No tortious conduct occurred during the enrollment period; the VA's negligent acts and omissions—including the failure to adjust Plaintiff's medication, the failure to provide transitional planning, and the administrative abandonment that followed—manifested beginning on or about October 16, 2023, as identified in Plaintiff's SF 95 administrative claim. The audit's scope covering the period of Plaintiff's success, rather than the period of Plaintiff's injury, underscores that the audit was designed to create confusion about the timeline of harm rather than to address any genuine oversight concern.

92.     By reason of the foregoing, Defendants are liable in an amount to be determined at trial, plus costs.

## COUNT 9 (VIOLATION OF FIFTH AMENDMENT DUE PROCESS)
### *ALL DEFENDANTS*

93.     JANE DOE repeats and re-alleges paragraphs 1 through 91 hereof, as if fully set forth herein.

94.     The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "No person shall be . . . *deprived of life, liberty, or property, without due process of law*.

95.     Plaintiff possesses a protected property interest in her service-connected benefits, her Vocational Rehabilitation & Employment (VR&E) status, and the integrity of her administrative record. *See Goldberg v. Kelly*, 397 U.S. 254 (1970) (holding that statutory entitlements are property interests protected by the Due Process Clause); *see also Cushman v. Shinseki*, 576 F.3d 1290 (Fed. Cir. 2008) (specifically holding that a veteran's entitlement to disability benefits is a property interest protected by the Due Process Clause).

96.     Defendants' coordinated "Administrative Pincer Maneuver"—simultaneously terminating housing stipends without AMA-compliant notice and initiating a "clinical abandonment"—constitutes an arbitrary exercise of government power that "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). This was not a mere clerical error but a deliberate effort to destabilize a disabled veteran during active litigation.

97.     This deprivation was further compounded by the VA's failure to maintain medical oversight during a period of documented vulnerability, which proximately caused Plaintiff's physical collapse on June 24, 2025.

98.     In a "Substantive Due Process" violation, the VA's conduct "shocks the conscience" because it represents a deliberate, multi-layered effort to destabilize Plaintiff and insulate the agency from liability. This conduct was not merely negligent, but strategically coordinated, beginning September 30, 2025, with the simultaneous publication of **VA OIG Audit Report 23-03328-197** (attached hereto as exhibit K) and an individualized **Notice of Privacy Practices (IB 10-163)** (attached hereto as exhibit J)—timed exactly one day prior to Plaintiff's FTCA refiling. Defendants further exploited this administrative framework by backdating Plaintiff's individual Notice of Privacy Practices to July 31, 2025, in a bad-faith attempt to 'bifurcate' Plaintiff's legal identity and apply retroactive data-sharing latitudes to records of past harm. These actions, coupled with the false March 3, 2026, report of 'wellness' to Congressman VINDMAN (VA-07), were designed to defeat Plaintiff's pending legal claims and constitute an arbitrary exercise of governmental power that offends the Decencies of Civilized

Conduct. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998). By poisoning the administrative record and stripping Plaintiff of the stability required to prosecute her claims, Defendants have effectively denied Plaintiff meaningful access to the courts and a fair adjudicative process.

99.    As a direct result of this Constitutional deprivation, Plaintiff suffered significant physical harm (including renal strain and hypokalemia) and permanent vocational damage.

100.    By reason of the foregoing, Plaintiff is entitled to Declaratory and Injunctive Relief as set forth in the Prayer for Relief, to restore the integrity of her federal records and ensure future compliance with the Due Process Clause.

## COUNT 10 (Spoliation and Record Tampering)

### *ALL DEFENDANTS*

101.    Plaintiff repeats and re-alleges paragraphs 1 through 99 hereof, as if fully set forth herein.

102.    Plaintiff brings these claims under the Privacy Act (5 U.S.C. § 552a) for failure to maintain accurate records, and under this Court's inherent authority to sanction the manipulation of evidence during pending litigation. On October 20, 2025, Plaintiff served a formal litigation-hold notice (attached hereto as Exhibit H) on the VA Office of General Counsel. The Defendants' obligation to preserve all records and metadata in their original, unaltered state was triggered no later than that date.

103.    Evidence of Real-Time Manipulation: On March 3, 2026, the same morning the VA transmitted an official response to a congressional inquiry (attached hereto as Exhibit F), Plaintiff attempted to access her MyHealtheVet portal. Plaintiff discovered that six years of medical records (2021–2026)—the exact years underlying her FTCA claims—had been removed from the patient-facing portal. Plaintiff documented this "lockout" window with timestamped screenshots showing the records were missing (attached hereto as Exhibit I).

104.    Fraudulent Restoration: Later that same afternoon, following the congressional disclosure, Plaintiff observed that the records were restored to the portal. However, the restored clinical note for May 21, 2025 (attached hereto as Exhibit Q), contained a substantive insertion of the subjective phrase "she otherwise feels well." This phrase directly contradicts the VA's false report to Congress that Plaintiff "required no medication," as she was prescribed a large dose of antibiotics in this period.

105.    Internal and External Refutation of Fabrication: The fraudulent nature of the "restored" note is established by two irrefutable facts:

(1) Internal Contradiction: While the "restored" note claims Plaintiff "felt well," the same note contains a physician's order to "INITIATE penicillin 500 MG". Under standard medical practice, antibiotics are not initiated for a patient who "feels well."

(2) Concealment of Metadata: The VA's complete denial of Plaintiff's October 2025 FOIA request (attached hereto as Exhibit G) served a dual purpose: it suppressed the mailing logs that would prove the VA delivered the medication it now claims was unnecessary, and it shielded the audit trails that would identify the specific employee(s) who accessed and modified Plaintiff's file during the March 3, 2026, "lockout" period.

106.    By reason of the foregoing, Plaintiff seeks:

(1) An adverse inference instruction directing the finder of fact to presume that the records removed on March 3rd were favorable to Plaintiff, and that the "restored" version is a fraudulent fabrication;

(2) Sanctions for post-litigation-hold evidence tampering;

(3) An emergency preservation order freezing all VistA/CPRS "B-Logs" and audit trails associated with Plaintiff's file;

(4) Production of all access logs for the date of March 3, 2026, identifying the workstation and user ID responsible for the modifications;

(5) Production of the original audio recording, raw system-captured transcript, and associated metadata for the clinical encounter between Plaintiff and Nurse CARLIE G. ELLIS on May 21, 2025;

(5) Compensatory damages for the emotional distress and physical harm caused by the intentional corruption of Plaintiff's medical history during a federal legal proceeding.

# PRAYER FOR RELIEF:

**WHEREFORE**, JANE DOE requests judgment as follows:

A.    On Count 1 (FOIA, 5 U.S.C. § 552), awarding an order compelling the VA to produce all improperly withheld records, a declaration that the VA violated FOIA, an order requiring the VA to conduct a lawful search, and an order requiring the VA to justify any future withholdings, plus costs.

B.    On Count 2 (Rehabilitation Act § 504, 29 U.S.C. § 794), awarding, awarding damages for physical and emotional harm in favor of Plaintiff in an amount to be determined at trial, and granting injunctive relief requiring the VA to cease discriminatory practices, restore accurate eligibility records, and ensure nondiscriminatory access to healthcare and administrative processes.

C.    On Count 3 (Privacy Act — Record Integrity, 5 U.S.C. § 552a), awarding actual damages in an amount not less than the statutory minimum of $1,000, and awarding injunctive relief requiring the VA to correct all inaccurate and backdated records, cease the creation of retroactive or fabricated federal documents, and maintain Plaintiff's records in compliance with the accuracy requirements of 5 U.S.C. § 552a(e)(5).

D.    On Count 4 (APA, 5 U.S.C. § 706), awarding injunctive and declaratory relief under 5 U.S.C. § 706, including orders requiring the VA to cease arbitrary and retroactive procedural practices and a remand for reconsideration under lawful, non-retroactive procedures.

E.    On Count 5 (FTCA Administrative Negligence), awarding compensatory damages in the amount of $7,500,000 for the physical deterioration and emergency hospitalization proximately caused by the interconnected administrative and clerical failures, and for the consequential

28

forced displacement, financial devastation, loss of vocational certification, and severe emotional distress arising from those physical injuries.

F.        On Count 6 (FTCA Psychiatric Negligence), awarding compensatory damages in the amount of $7,500,000 for the documented physical and neurological injuries proximately caused by psychiatric negligence, resulting in total academic collapse, permanent loss of Plaintiff's doctoral career trajectory, and destruction of her professional identity as a prospective Doctor of Audiology; further awarding compensatory damages for the permanent loss of the enjoyment of life, the irreversible physical depletion of the executive function and cognitive bandwidth required to perform clinical doctoral-level practice, and the singular, non-replicable loss of a structured professional path specifically designed for Plaintiff's neuro-cognitive profile.

G.        On Count 7 (FTCA Dental Negligence), awarding compensatory damages in the amount of $200,000 for dental negligence and failure to provide timely emergency treatment for an active infection, including damages for avoidable physical pain and suffering, financial harm, and emotional distress arising from the untreated physical condition sustained during the 29-day delay between diagnosis and extraction.

H.        On Count 8 (FTCA VR&E Professional Negligence), awarding damages in an amount to be determined at trial for professional negligence by VR&E staff in breach of mandatory duties under VA Directive M28C, compounding the physical and neurological injuries described herein and resulting in total loss of lifetime earning capacity and the transformation of Plaintiff's intellectual assets into an unmonetizable resource through failure to provide the vocational infrastructure and rehabilitative support required to bridge documented academic performance and gainful employment.

I.        On Count 9 (Violation of Fifth Amendment Due Process), a Declaratory Judgment that the Defendants' post-litigation manipulation of Plaintiff's federal medical records and the resulting effects of that harm constitutes an unconstitutional deprivation of Plaintiff's protected property interests in her legal claims; Permanent Injunction prohibiting the Defendants from further altering, 'scrubbing,' or bifurcating Plaintiff's medical or administrative records; and Injunctive Relief requiring the Defendants to restore the integrity of the clinical record by purging all non-contemporaneous, fraudulent 'wellness' entries created after the March 3, 2026, data nullification event.

J.        On Count 10 (Spoliation and Record Tampering), an adverse inference instruction directing the finder of fact to presume that all records removed from Plaintiff's portal were favorable to Plaintiff and that the 'restored' records containing 'wellness' claims are fraudulent fabrications; Sanctions against Defendants for post-litigation-hold evidence tampering; An emergency preservation order freezing all records and audit trails associated with Plaintiff's patient file; Production of all VA access logs and audit trails for Plaintiff's patient FTCA and FOIA files from May 16, 2025 through the date of judgment; Compensatory damages for the harm caused by the manipulation of medical records during pending litigation.

K.        Granting JANE DOE such other and further relief as the Court deems just and proper.

Respectfully submitted,

*Jane Doe,* Plaintiff Pro Se
Email: lightfoot649@gmail.com
Additional contact information submitted
with Plaintiff's contemporaneously filed
Motion to Proceed Under Pseudonym.

Dated: April 6, 2026, Alexandria, Virginia